# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40086**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Terry J. TAYLOR II**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 August 2022

————————————

*Military Judge:* Bryan T. Gleisner.

*Sentence:* Sentence adjudged 5 March 2021 by GCM convened at MacDill Air Force Base, Florida. Sentence entered by military judge on 28 April 2021: Dishonorable discharge, confinement for 32 months, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major Kasey W. Hawkins, USAF; William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge KEY and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial composed of a military judge sitting alone convicted Appellant of one specification of sexual assault of BT, by penetrating her vulva with his penis, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] Appellant was sentenced to a dishonorable discharge, confinement for 32 months, and reduction to the grade of E-1. The convening authority approved the sentence in its entirety.

Appellant raises six assignments of error on appeal: (1) whether the evidence was factually sufficient to support his conviction for sexual assault; (2) whether the military judge committed plain error when he allowed the Government to introduce hearsay statements; (3) whether trial counsel engaged in prosecutorial misconduct by making improper arguments during findings argument; (4) whether the military judge committed plain error when he allowed testimony, given without a proper foundation and not directly related to Appellant's offense, to be admitted in presentencing; (5) whether trial defense counsel were ineffective; and (6) whether Appellant's record of trial is substantially complete. We have carefully considered issue (4) and part of issue (5) as related to issue (4), and determine these issues are without merit and warrant no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Regarding issue (6), we find no relief is warranted.[2] Finding no error that has materially prejudiced the substantial rights of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant entered active duty in April 2016 and was stationed at MacDill Air Base (AFB), Florida. At the time of his offense, Appellant was 21 years old. Appellant's offense occurred on 23 March 2019, while both he and the victim, BT, were serving on a deployment. Appellant was not tried until 2 March

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Before Appellant's trial, the Defense filed a motion to compel an expert consultant. In its response to the motion, the Government submitted six attachments, two of which were not included in the record of trial. Appellant argued the omission of these two attachments was "quantitatively substantial." Pursuant to *United States v. Jessie*, 79 M.J. 437, 442–43 (C.A.A.F. 2020), on 27 April 2022, this court granted a Government motion to attach a declaration from the trial counsel addressing the matter, which also contained the missing attachments. Having reviewed the record, we find Appellant did not suffer any material prejudice from the missing attachments and that corrective action is not warranted.

2021.[3] Appellant argues, in part, that the Government's evidence at trial did not prove beyond a reasonable doubt that Appellant committed a sexual assault against BT, primarily because her statements concerning the events of 23 March 2019 were inconsistent and "logically and anatomically improbable" as to whether penetration occurred. Appellant also argues BT had a motive to fabricate the allegations to protect her relationship with SSgt MR.

## A. BT's Testimony

In October 2018, BT and approximately ten members of her security forces squadron from Tyndall AFB, Florida, deployed to a forward operating location, where the team protected assets and provided installation security.[4] A short time after this group arrived, approximately ten more security forces members from MacDill AFB, including Appellant, arrived at the deployed location. The group from Tyndall AFB worked a 12-hour night shift, whereas the group from MacDill AFB worked a 12-hour day shift. BT initially was assigned to a team with Staff Sergeant (SSgt) DS and Senior Airman (SrA) LS (who was also BT's initial roommate); however, approximately a month and a half after their arrival, BT was moved to a team with SSgt MM and SrA SSG. All of these Airmen came from Tyndall AFB. The security forces personnel were housed in a local apartment complex; SSgt DS and SrA SSG lived together next door to BT.

BT first met Appellant in late October or early November 2018, when she, members of her team, and a few of the Airmen from MacDill AFB—including Appellant—went to a restaurant for dinner. After dinner, BT went out to a bar with members of her team and then back to her apartment to continue drinking alcohol. Eventually, some of the MacDill AFB Airmen came to BT's apartment as well, including Appellant. As the evening began to wind down, everyone left BT's apartment except for Appellant. BT testified at trial that she and Appellant later had consensual sex.

Approximately two weeks later, Appellant knocked on BT's apartment door and asked BT if she would like to go out drinking with him and a few other people. BT testified that Appellant "seemed like he was drinking" and she therefore declined his offer. BT testified Appellant then "leaned in to kiss [her]" on the lips; however she "put [her] hands up," turned away, and told Appellant that what previously happened was a "one-time thing and that [they] weren't

---

[3] Appellant's case was preferred on 4 December 2019 and referred on 21 January 2020. However, due to the coronavirus pandemic, on 10 June 2020, the military judge granted a defense motion for a continuance until 1 March 2021. Appellant was arraigned on 14 December 2020.

[4] The court has chosen not to disclose the location of the deployment.

anything after that." Appellant responded, "Oh, okay," then, according to BT, Appellant "shrugged" and "immediately left."

The next time BT saw Appellant was sometime in December 2018. BT testified she was not working on this occasion and that between 2100 and midnight, was asleep in her bed. BT's roommate was working this night. At some point, BT felt her bed "sink." She described what happened next: "almost immediately after[,] I felt [ ] body heat press up against me, and I felt an arm drape around me, and I felt skin to skin contact." BT turned to face the person, "and at that point [Appellant] had mumbled something along the lines of 'Can I stay here tonight?'" BT then recognized it was Appellant who had gotten into her bed next to her. BT believed Appellant may have been wearing shorts, but remembered he was not wearing pants or a shirt. She also stated Appellant smelled of alcohol, and that "the smell of alcohol was so strong that [she] thought maybe he had wandered into the wrong apartment." BT testified Appellant did not exhibit any aggressive behavior towards her and that he did not seem like he wanted to do anything. BT decided to let Appellant "sleep it off" and prepared to go to the gym. As BT was making a protein shake near her kitchen sink, she felt Appellant's arms wrap around her waist area. BT turned around and put her hands up to Appellant's chest to "gently" create some distance between them. BT testified she told Appellant "once again . . . that [their] first encounter was a one-time thing," that they were not going to have sex again, and that she was leaving for the gym. Appellant, shrugged, said, "oh, okay," went to gather his things, and left BT's apartment.

BT's roommate left the deployed location in January or February 2019 and BT had the apartment to herself. On 22 March 2019, between 1900 and 2030, BT, SSgt MM, and SrA SSG went to a movie. After the movie, the group decided to go out to a bar to celebrate one of their last weekends in the deployed location. While at the bar, BT drank beer and tequila. She consumed three to four drinks and felt "buzzed" by the time they left the bar, but did not feel like she had a high level of intoxication. Because the group had a midnight curfew, they left the bar and went to the apartment shared by SSgt DS and SrA SSG "to continue hanging out and drinking." SSgt MM was also at this gathering.

At approximately 0007 on 23 March 2019, BT received a message from Appellant over Instagram[5] asking her what they were doing. BT replied, "DRANKIN." Appellant asked BT what she was drinking and she replied, "S[**]t if I know whatever [SSgt DS] and them make me lok [sic]." Appellant asked BT if he could join the group and she told him to ask SSgt DS since it was his room. Appellant asked BT to put SSgt DS on the phone and they communicated with a few messages. SSgt DS provided Appellant with his apartment number. At

---

[5] Instagram is a social media application.

approximately 0011, Appellant told BT he was heading over the apartment. BT testified Appellant showed up at SSgt DS's apartment about 30 minutes to an hour later.

While in SSgt DS's apartment, BT continued to drink alcohol. When Appellant arrived, BT recalled Appellant bringing a bottle of vodka that was 70 to 80 percent full. Once he arrived, Appellant sat next to BT, put his hand on her waist area, and started to "softly" stroke her side, which made BT feel uncomfortable. BT shrugged Appellant off her, but did not confront him or "make a big deal out of anything" because she did not want to make the situation awkward. However, a few minutes later, Appellant wrapped his arm around BT again and started to stroke her side. At this point, BT got up and abruptly excused herself to the bathroom. When she came back, although she felt she had resolved the situation, Appellant touched BT's waist a third time; each time was over her clothing. BT got up and moved across the room to sit by SSgt DS.

Although the "vibe" of the gathering was winding down, SSgt MM suggested putting on some music. SSgt MM had a speaker, which was in BT's apartment. SSgt DS and BT went to BT's apartment to get the speaker. Upon entering the door, BT tripped and fell. After she fell, BT told SSgt DS she was going to "call it a night" and go to bed. SSgt DS then left the room.

BT testified she laid horizontally across the foot of her bed on her stomach, but her feet were dangling off the bed. Her head was facing the wall, away from the door of her room. In terms of how low BT's bed was to the floor, BT testified the top of her mattress would hit about "upper to mid-thigh in height" on her body. As she was lying on her bed, BT heard the main door of her apartment click. BT assumed it was SSgt DS entering her room to get the speaker, so she did not move her body; however, she did look in the direction where she heard the noise. When she did this, she saw Appellant in the doorway of her bedroom. As the lights were on in her room, BT saw Appellant walking forward and take off his shoes, kicking them off at the foot of her bed.[6]

BT asked Appellant what he was doing. She testified about what happened next: "[H]e proceeds to move to where my feet are; so behind me; so, he's kind of escaping my vision." Once BT saw Appellant move behind her, and while she was still on her stomach, BT tried to push herself up with her arms and look behind to see what Appellant was doing. BT then felt Appellant grab her legs and pull her towards him in an "aggressive and abrupt" action. BT stated that

---

[6] Prosecution Exhibit 4 contains pictures of BT's apartment and bedroom, presumably taken later that day after BT reported the incident. On page 5 of the exhibit, Appellant's shoes are still in BT's bedroom when the photographs were taken. BT identified them as Appellant's shoes during her testimony.

"most if not all of [her] legs [were] off of the mattress at that point" and that her buttocks and pelvic region were on the edge of the bed, "literally curved around the bed." BT testified she told Appellant to "stop," and tried to hit him with her forearms to get him to stop, but Appellant grabbed her arms and pinned them so that she could not push up off the bed.

At this point, BT was still wearing pants, or "skinny jeans." Appellant reached underneath BT's jeans, undid the button, gripped at the waistband, and pulled BT's jeans down to "probably about [her] mid-shin." BT could feel Appellant's body weight on her upper thighs and buttocks area, essentially pinning her into place. BT then felt her underwear go down and felt Appellant's erect penis against her buttocks. BT testified she could feel Appellant searching for her vaginal entrance with his penis. She then felt a forceful thrust into her vagina and that it hurt when his penis entered her vagina. Although BT did not see Appellant's penis enter her vagina, BT testified that Appellant had a long penis, and that what she felt enter her vagina was not a finger. Once Appellant's penis penetrated BT's vagina, she felt "an adrenaline rush." Almost immediately, she "thrust[ed]" herself forward, up and away from Appellant, and then "roll[ed] violently off of the bed." BT immediately left her apartment.

As she was leaving, BT's jeans and underwear were still about "mid-shin." BT testified that she pulled her pants up while exiting her room, and that she went to SSgt DS's apartment. BT threw open the door to SSgt DS's apartment, and once she entered the apartment, collapsed and started crying. BT did not tell anyone what happened as she was not "in [a] position to talk at that point." BT slept at SSgt DS's apartment the remainder of the night. The next morning, SSgt DS asked what happened. BT stated she only told him the "very bare minimum," as she was "still trying to fully grasp what had happened."

**B. Testimony of SSgt DS and SSgt MM**

The Government called SSgt DS and SSgt MM as witnesses in its case in chief. SSgt DS testified that on the night of the incident, BT and SSgt MM came to his apartment to have drinks and play video games. Eventually, Appellant texted BT and asked what she was doing, and asked to come over; SSgt DS agreed Appellant could come over. While at the apartment, SSgt DS noticed that Appellant's attention at the party was towards BT, and that he "really wanted to be . . . around her."

SSgt DS confirmed that he and BT went to her apartment to retrieve the aforementioned speaker, and that once they walked through the door, BT fell down. After she fell, BT told SSgt DS that she wanted to go lay down. SSgt DS stated he saw BT get in bed, turned off her light at her request, then left the room. As SSgt DS was leaving the apartment, he saw Appellant standing at

the front door of BT's apartment. SSgt DS testified Appellant told SSgt DS that he wanted to talk to BT. SSgt DS testified about what happened next:

> I said, "Hey, [BT's] tired. So, she's like laying down." I was like, "You're free to come back to the apartment and hang out with us or, you know, go do whatever you want to do." I don't know if I told him like he had to go back to his room or not. But I did tell him like he was free to come back and hang out at the apartment with all of us.

On cross-examination, SSgt DS noted that during their conversation outside of BT's apartment, Appellant was slurring his words. After that conversation, SSgt DS returned to his apartment; he believed Appellant was right behind him, as he heard Appellant's footsteps. Once he got back to his apartment, SSgt DS realized Appellant was not behind him and believed Appellant went back to Appellant's room.

Roughly 10 to 20 minutes after SSgt DS returned to his apartment, BT entered his apartment "[i]n a rush, a panic, shocked." To SSgt DS, "[i]t seemed like she was overwhelmed, delirious because she kind of seemed like she didn't know where she was at . . . [l]ike she was [ ] running away from something." SSgt DS noticed BT's pants were undone and "[t]hey were basically [ ] falling off," as "her button and zipper [were] undone and her pants were kind of off." SSgt DS could also see BT's undergarments. Once BT was in his apartment, SSgt DS testified about what occurred:

> We're trying to get her to calm down. She's hyperventilating. She's crying. We're trying to get her to talk. The only thing she's saying is like--she's trying to say my name and trying to get something out but she is not able to. She's kind of like-- We're trying to get her up off the ground but she's curling up into a ball.

SSgt DS was trying to figure out what was going on, so he looked down the hallway and saw BT's apartment door was open. He walked to her room and saw Appellant on BT's bed, sleeping on top of the sheets with his clothes on. SSgt DS turned on the light and asked Appellant what happened to BT. Appellant eventually told him words to the effect of, "I didn't do nothing," or "nothing happened." SSgt DS testified Appellant's shirt was wrinkled, as compared to earlier, when it was not. BT ended up staying at SSgt DS's apartment that night. The next morning, BT told SSgt DS that after he left the room, "she felt like somebody was like over her . . . [Appellant] was behind her and . . . she said that he was basically f[**]ing her from behind."

SSgt MM also testified about his observations that night. He testified that he remembered SSgt DS and BT leaving to retrieve a speaker from BT's room,

that SSgt DS returned alone, and that five to ten minutes after SSgt DS came back to the apartment, BT "barged through the door" and fell on the floor by the kitchen. SSgt MM described BT's condition while she was on the floor as one of shock, stating:

> She was sitting there. We were trying to figure out what was going on. She was not able to really speak on what was going on. Anything we were asking; it wasn't getting an answer. She was kind of like pushing and pulling away from us. We were trying to figure out what was like going on. We were trying to like help her; but it was like-- that aspect that she was pushing us away but also trying to grab on to us, like hold on to something.
>
> . . . .
>
> . . . The only thing that we ended up getting her to say at one point was that she wanted [SSgt DS]. And all she was saying was [SSgt DS's] name.

SSgt MM stated he followed SSgt DS to BT's room. When they walked into the apartment, they saw Appellant lying in BT's bed, clothed. SSgt DS was yelling at Appellant to get out of BT's room. SSgt MM had SSgt DS leave the apartment and he made sure Appellant left BT's room. SSgt MM walked Appellant back to his room. While they were walking back to his room, Appellant stated, "I didn't do anything" multiple times.

The next morning, BT told SSgt MM she fell asleep and woke up to Appellant laying on her, and that Appellant had penetrated her. SSgt MM reported the sexual assault to his leadership.

## C. Additional Evidence and Background

At 0233 on 23 March 2019, shortly after BT went to SSgt DS's apartment, Appellant sent BT a message on Instagram stating, "Hey I didn't do anything to you, right? Cause [SSgt MM] is trippin." At 0837 that same day, Appellant sent BT another message on Instagram stating, "[For real] did I do something to you because if so, I am so so sorry I really am." BT did not respond to either message.

At approximately 1200 on 23 March 2019, BT submitted to a sexual assault forensic exam (SAFE). The physician who conducted the exam, Major (Maj) SF, noted a patch of redness on BT's cheek and one on her neck, but did not note any other injuries to BT's body, including her genitals. Maj SF also did not observe any areas of semen, blood, discharge, "or other complaints." BT did not provide Maj SF a detailed history of the sexual assault. BT also provided a written statement to agents from the Air Force Office of Special Investigations (AFOSI). In that statement, BT stated, *inter alia*, "[Appellant] tried pulling me

towards him, and I felt his weight on top of me, this is when I felt his penis against me, and enter my vagina."

Two days later, with an escort, BT was flown back to her home station. Within hours of her arrival on 26 March 2019, she submitted to a second SAFE; BT declined a second genital examination. As part of BT's forensic examination, Captain (Capt) ICC, the Sexual Assault Medical Forensic Examiner, asked BT to provide a narrative description of the alleged assault. This narrative description was documented in Prosecution Exhibit 7, "DoD Sexual Forensic Examination SAFE Report," and admitted without defense objection. Capt ICC read the following excerpt from her report as to what BT reported: [7]

> [S]he went drinking that night with her friends. The suspect texted her asking if he could come and drink with her and her friends. Victim told suspect that she needed to ask her neighbor first. Neighbor said yes. They were drinking and victim went to the apartment to get some speakers with her friend. Then the victim ended up falling and decided to go to sleep on her bed. Her friend took the speakers and went back to her room next door. Not too long after her door -- not too long after, her door open and it was the suspect. Suspect took off his shoes. Victim was sleeping on her belly and suspect started taking her pants off and then she tried to push his hands off but suspect pinned her arms down and took her pants off and started penetrating her. At some point, he released her hands and she pushed him off. Suspect got off the bed and victim ran out of the room. Victim went to the next-door neighbor and stayed there.[8]

In response to Defense's cross-examination questions, Capt ICC testified that BT told her Appellant had bitten her and kissed the back of her neck, but that there was no struggle between BT and Appellant, and no scratching.

While deployed, BT became interested in dating SSgt MR, who was also stationed at Tyndall AFB, but did not deploy to the deployed location. By February 2019—a month before the incident involving Appellant—BT was talking to SSgt MR "more or less" every day. BT wanted the relationship to become

---

[7] During Capt ICC's testimony, trial counsel asked her to read the narrative description of the assault from the report in order to avoid "any confusion," since that portion of the report was in Capt ICC's handwriting. This narrative description is discussed further, *infra*, in response to another assignment of error raised by Appellant.

[8] Internal quotation marks omitted. The court notes there are minor differences from what Capt ICC read in court, compared to what she wrote in the SAFE Report.

serious after the deployment, but in the immediate aftermath of the incident, she was afraid to tell SSgt MR about the alleged assault. BT provided few other details about this relationship during her testimony.[9] However, SSgt MM and SSgt DS both testified about conversations they had with BT about her relationship with SSgt MR. SSgt MM testified that in December 2018 or January 2019, BT told him that she wanted to have a future with SSgt MR and that she did not have any romantic interest in Appellant because she was interested in SSgt MR. SSgt DS testified BT's relationship with SSgt MR became more serious during the deployment. Six days after the alleged assault, BT told SSgt DS that she was worried about how the alleged assault would affect her relationship with SSgt MR, telling SSgt DS she felt like she had let SSgt MR down.

On 28 August 2019, BT interviewed with agents from AFOSI. During this interview, an agent asked BT, "What part of your body did you feel that, his penis? And how do you know it was his penis?" BT responded, "I mean, I still felt like his legs against me and I guess I just assumed that it was his penis." The agent then asked, "At that time, did he still have his pants on or his underwear, or was it like skin to skin?" BT answered, "I don't know if it was skin to skin or if it was really thin material, but it was one or the other. It was either boxers or skin to skin." The agent then asked, "How did you know that it was his penis?" BT responded, "I don't know. I guess I just felt it pushed up against me." Shortly after BT's response to this last question, her special victim's counsel (SVC) requested a break from the interview and left the interview room with BT. Approximately 15 minutes later, BT and her SVC returned to the interview room, where the first thing BT stated to the agents was, "I just want to be clear. I know 100 percent certain that it was his penis."

On 28 February 2021, BT interviewed with the prosecutors in the case. During this interview, BT alleged for the first time that Appellant had pulled the lower half of her body off the bed during the assault.

BT's jeans were admitted into evidence. During her testimony, BT demonstrated the elasticity of her jeans for the military judge. Ms. RK, a forensic biologist assigned to United States Army Criminal Investigation Laboratory, testified that DNA testing was conducted on the button and zipper area of BT's jeans, as well as her underwear. Ms. RK testified that the swab of the jeans indicated a DNA mixture from four individuals, including BT and Appellant. Ms. RK also indicated Appellant's DNA was a contributor to a DNA mixture found on the waistband of BT's underwear. A vaginal swab from BT revealed

---

[9] In presentencing, BT testified she was in a relationship with SSgt MR, that they had a child together, and that when SSgt MR's Air Force contract ended, they were moving back to where BT was from.

no conclusive male DNA profiles and there was no DNA to show that penetration occurred.

On appeal, Appellant challenges the factual sufficiency of his conviction, but not its legal sufficiency.

## II. DISCUSSION

### A. Factual Sufficiency

Much of Appellant's argument focuses on the improbability of the crime itself, noting that despite Appellant's level of intoxication, according to BT, Appellant was "able to pin her arms down while also unbuttoning and unzipping her jeans and pulling her jeans and underwear down," that he did this "from behind her while she was laying on her stomach and struggling to push up and hit him and get off of the bed," and "that despite her efforts to get away and while holding her arms down, [Appellant] was able to penetrate her vagina with his penis in one thrust." Appellant highlights the lack of physical evidence in this case to argue the Government failed to meet its burden—namely, the lack of injuries to BT, lack of evidence of forced penile penetration, and lack of male DNA collected from the vaginal swabs of BT, despite two separate forensic examinations. Appellant further argues BT's version of the events varied over the course of the investigation, focusing on whether BT was asleep or awake when Appellant entered her room, whether there was actually a struggle, and the disclosure for the first time in February 2021—nearly two years after the incident—that she was pulled off the bed during the assault. Finally, Appellant notes that BT did not make an allegation of sexual assault when she entered SSgt DS's apartment.

#### 1. Law

We review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Appellant was convicted of sexual assault, in violation of Article 120, UCMJ. The Government was required to prove two elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon BT; and (2) that Appellant did so without BT's consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). "Sexual act" includes "penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, Part IV, ¶ 60.a.(g)(1)(A). "'[C]onsent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *MCM*, Part IV, ¶ 60.a.(g)(7)(A).

**2. Analysis**

We find the evidence that Appellant penetrated BT's vagina without her consent is factually sufficient.

The evidence is clear that Appellant was interested in BT, either romantically or sexually, even though she did not want a relationship with him. On two occasions leading up to 23 March 2019, Appellant made unwanted advances towards BT. On the night in question, Appellant continued to make advances towards BT, which even caught the attention of SSgt DS. After BT left SSgt DS's apartment, Appellant left the apartment as well to go to BT's apartment, but was stopped by SSgt DS—who told him that BT was "laying down," inferring that she was not to be bothered. SSgt DS even invited Appellant to come back to SSgt DS's apartment. Even though SSgt DS heard Appellant's footsteps, as if Appellant was following SSgt DS, Appellant turned back around and went to BT's apartment anyway.

Contrary to Appellant's assertion, there was physical evidence, in the form of DNA evidence, to support BT's testimony that Appellant was on top of her and at some point touched her jeans and underwear. BT testified Appellant pinned her down, pulled her pants down, and forcefully inserted his penis into her vagina. She also described for the court the size of Appellant's penis, which dispelled the possibility that Appellant had digitally penetrated her vagina instead of penetrating her with his penis.

Most importantly, BT's almost instantaneous reaction to Appellant's acts supports her testimony that Appellant sexually assaulted her. With virtually no delay from Appellant's acts—and with her jeans not fully on, as articulated by SSgt DS—BT ran to a room with people she knew and appears to have trusted, in a state of panic and shock, apparently unable to speak to even convey what happened. The next morning she told SSgt DS that Appellant was "f[**]ing her from behind," told SSgt MM about the sexual assault, and in a written statement to AFOSI, stated that Appellant had penetrated her. BT also provided details of the incident to Capt ICC—that Appellant penetrated her vagina.

We do not find Appellant's statements in the minutes after SSgt DS and SSgt MM found him in BT's bed—that he did not do anything to BT—credible. Although the Defense attempted to portray Appellant as too intoxicated to have been able to have sex with BT, he messaged BT in the minutes after the sexual assault.[10] Based on its timing, we find his message, "Hey, I didn't do anything to you, right? Cause [SSgt MM] is trippin," to not be a credible indication that he was unaware of what he had done, but an indication of his consciousness of guilt. In other words, we doubt that Appellant was so drunk that he could not appreciate his actions against BT, yet, minutes later, was able to ask her whether he had done anything wrong.

Finally, Appellant's argument that BT had a personal motive to fabricate her allegation against Appellant because she was interested in another Airman, is not persuasive. The testimony revealed that, while BT was deployed, she became interested in dating SSgt MR, who was stationed at Tyndall AFB with BT but did not deploy to the deployed location with her. The testimony shows that they talked frequently while BT was deployed and therefore over time, and before the incident involving Appellant occurred, BT became interested in having a relationship with SSgt MR. We do not find it unreasonable for BT to have been afraid to tell SSgt MR about the sexual assault, as this was a budding relationship. It was also not unreasonable for BT to have been worried about how this crime would affect her future with SSgt MR. The Defense was free to explore the connection between that relationship and a possible motive by BT to fabricate a sexual assault; however, we find no support to conclude that BT concocted a story about sexual assault to somehow further her relationship with SSgt MR.

We recognize there were inconsistencies between portions of BT's in-court testimony and statements she made leading up to Appellant's trial, particularly regarding the positioning of both Appellant and BT when the sexual assault took place. We also recognize that while there was some DNA evidence, there was a lack of physical evidence that Appellant penetrated BT's vagina with his penis. However, sexual contact is penetration, however slight, and we are convinced that Appellant's penis penetrated BT's vagina. As outlined above, we find BT's overall testimony was credible and that there was strong corroborating evidence of Appellant's guilt. After weighing all the evidence in the record of trial, and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. We also conclude that a rational factfinder could have found beyond a

---

[10] Appellant arrived at SSgt DS's apartment approximately between 0045 and 0115, based on BT's testimony. We can reasonably assume this message was sent shortly after Appellant was taken away from BT's apartment by SSgt MM.

reasonable doubt all the essential elements of Appellant's convicted offense. Therefore, we find Appellant's conviction factually sufficient.

## B. Introduction of Hearsay Statements

### 1. Additional Background

Appellant argues the military judge committed plain error when he allowed the Government to introduce hearsay statements through Capt ICC's testimony and portions of her SAFE report documenting her examination of BT. Capt ICC's report was pre-admitted in its entirety by the Government, before findings began; the Defense affirmatively stated it had "no objection" to the report. During Capt ICC's testimony, trial counsel asked her to read the narrative description of the assault from the report in order to avoid "any confusion," since that portion of the report was in Capt ICC's handwriting. Capt ICC read the excerpts from her narrative report, as previously quoted above, to what BT reported to her. Trial defense counsel did not object to the reading of this narrative.

As part of his argument on appeal, Appellant further notes that Capt ICC asked BT other questions with respect to the alleged assault and "recorded those answers on the form as well." Appellant notes: "This additional information included a statement that [BT] had been penetrated by a penis, that she had been kissed and bitten on her neck, and that she reported being 'pulled by the neck but she still could breathe.'" Appellant argues that Capt ICC's testimony, and the admission of portions of Capt ICC's report, "added aggravating details to the alleged assault that [BT] never testified to," and that "[t]hese claims elevated the level of violence beyond that alleged by [BT] and aggravated the charged offense."

Appellant argues the statements were not admissible under a hearsay exception for statements made for medical diagnosis or treatment [under Mil. R. Evid. 803(4)] because there was "no medical benefit [ ] derived from the examination, only a forensic benefit," nor were the statements admissible as a prior consistent statement under Mil. R. Evid. 801(d)(1)(B). Appellant asserts a plain error analysis applies, but does not fully address waiver in his argument. Instead, Appellant claims the military judge committed plain error because the statements in Capt ICC's report "were hearsay and did not fit into an exception or exclusion from the rule against the admissibility of hearsay at trial" under Mil. R. Evid. 801(c).

### 2. Law

While this court reviews a military judge's decision to admit or exclude evidence for an abuse of discretion, *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted), when an appellant does not raise an objection to the admission of evidence during trial, we first determine whether the

appellant waived or forfeited that objection. *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted). Whether an accused has waived or instead forfeited an issue is a question of law this court reviews de novo. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citation omitted).

"[F]orfeiture is the failure to make the timely assertion of a right . . . ." *Id.* (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). We review forfeited issues for plain error. *Id.* (citing *Gladue*, 67 M.J. at 313). To prevail under a plain error analysis, an appellant must show (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the appellant. *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted).

"Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (quoting *Gladue*, 67 M.J. at 313). "Consequently, while we review forfeited issues for plain error, . . . a valid waiver leaves no error for us to correct on appeal." *Id.* (internal quotation marks and citation omitted).

Stated another way: "A forfeiture is [ ] an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law." *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (internal quotation marks and citation omitted).

**3. Analysis**

This court has applied five non-exhaustive factors when considering whether waiver has been clearly established and there is an intentional relinquishment or abandonment of a known right or privilege. *United States v. Monarque*, No. ACM S32412, 2017 CCA LEXIS 245, at *10 (A.F. Ct. Crim. App. 6 Mar. 2017) (unpub. op.) (citations omitted). Those factors include:

> (1) whether the right was a known right or privilege at the time of the waiver; (2) whether the waiver was part of the defense's trial strategy; (3) whether the defense had knowledge of the proffered evidence and had time and opportunity to review it; (4) whether the defense was given an opportunity to object to the admissibility of the evidence; and (5) whether [the appellant] now raises ineffective assistance of counsel with regard to the issue of waiver.

*Id.* (footnotes and citation omitted).

Applying the factors this court articulated in *Monarque* to the present issue, (1) the military judge asked the Defense if there was an objection, and the Defense therefore knew any objection was a known right; (2) there is evidence

before the court to determine that the waiver was part of the Defense's trial strategy, as civilian defense counsel used the exhibit to highlight inconsistencies between BT's SAFE and her testimony, particularly regarding her lack of injuries; (3) based on the record of trial, it is clear that the Defense had knowledge of the report as it was an exhibit in the Article 32, UCMJ, preliminary hearing report, and had time and opportunity to review it; and (4), the record is clear that the military judge gave the Defense an opportunity on the record to object to the admissibility of the evidence, and trial defense counsel specifically stated he had no objection to the exhibit.

With respect to the fifth factor, Appellant has raised ineffective assistance of counsel with regard to the issue of waiver, due to civilian defense counsel's failure to object to the exhibit's admission. However, for reasons to be discussed shortly, we find trial defense counsel were not ineffective in their representation on this issue.

Our superior court has explained that under the ordinary rules of waiver, an appellant's affirmative statements that he had no objection to the admission of evidence "operate[s] to extinguish his right to complain about [the evidence's] admission on appeal." *Ahern*, 76 M.J. at 198 (citations omitted). Under the particular facts of this case, we find the Defense's affirmative decision not to object to the admission of Capt ICC's report is a situation where the ordinary rules of waiver apply. As such, the Defense waived this issue. Separately, we recognize our authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce a waiver in order to correct a legal error. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018) (citation omitted). We decline to exercise that authority here.

With respect to Capt ICC referring to the narrative portions of her SANE report during her testimony, in the absence of a Defense objection, Appellant forfeited his claim about Capt ICC testifying as to the contents of that narrative in the report, and thus we analyze this portion of Capt ICC's testimony for plain error. Because Capt ICC's report had already been admitted into evidence, even assuming we found clear or obvious error, we find Appellant was not prejudiced from the admission of what was merely a recitation of facts that had been previously admitted, especially given that the Defense used the evidence as part of its strategy, and in consideration that this was a judge-alone case. We grant no relief on this issue.

## C. Improper Argument

Appellant contends trial counsel committed prosecutorial misconduct in that he (1) misstated the evidence, (2) interjected personal opinions into his argument, and (3) improperly disparaged defense counsel, and ultimately, his

argument was unfairly prejudicial. We have considered trial counsel's statements and arguments and find no error.

### 1. Additional Background

#### a. Misstatement of the Evidence

Appellant claims trial counsel misstated the evidence when describing SSgt DS's interaction with Appellant outside of BT's apartment before the incident. In his closing argument, trial counsel stated,

> Your Honor, you know he committed a sexual act on her because of what he said and what he did. [SSgt DS] told you he saw him *creeping around* outside the victim's apartment. He said, "I'm going to go talk to the victim." "I'm going to go talk to [BT]."

(Emphasis added). Trial counsel further argued, "[SSgt DS] tells him, '*Go home.*' And he heard him walking away. He assumes he's actually gone home. But he comes back. There's no reason for him to come back at that moment." (Emphasis added).

In rebuttal, trial counsel argued, "[A]sk yourself why was he even in that apartment in the first place *after she's gone to bed* and [SSgt DS] tells him to *go home.*" (Emphasis added).

The Defense did not object to these parts of trial counsel's argument. Appellant now argues that trial counsel misstated and mischaracterized SSgt DS's testimony, as SSgt DS did not use the word "creeping," or tell Appellant to "go home." On appeal, Appellant claims trial counsel's "argument characterized [Appellant] as a predator, insisting on seeing BT even though he knew she had gone to sleep, pretending to obey an order to go home, but then returning surreptitiously to 'creep' around and into her apartment." Appellant further claims this characterization "was deeply prejudicial as it gave the factfinder an inaccurate and menacing view of [Appellant's] actions."

#### b. Trial Counsel's Personal Opinions

Appellant further asserts that trial counsel interjected personal opinions into his argument. At one point in his argument, trial counsel stated, "Your Honor, as the Court's very well aware, as a factfinder, you have the duty to determine who's telling you the truth. You've heard from both people in this case---." As Appellant correctly notes: "Civilian defense counsel objected and pointed out that [Appellant] had not testified. [ ] The [m]ilitary [j]udge noted that [Appellant] had a constitutional right not to testify and warned [t]rial [c]ounsel to avoid commenting on that right."

After this warning, trial counsel argued the military judge had heard Appellant's statement to SSgt DS and that he had heard from BT when she testified. Trial counsel then stated, "And we know that what she told you was true," then proceeded to make arguments about why BT was credible. In his brief, Appellant raises other similar instances where trial counsel argued to the military judge that BT was being truthful, stating:

> Trial counsel told the Military Judge, "you know that she's telling you the truth because she's been consistent in her description of what actually happened in that room that night." [ ] He then argued, "you also know she's telling the truth because she was willing to go through multiple forensic examinations." [ ] Again, [t]rial [c]ounsel argued, "you know she's telling you the truth because at this point, she has nothing to gain." [ ] And then, "you know she's telling you the truth because at the end of the day, she has no motive to lie." [ ] And, "you know she's telling you the truth because she's supported by other evidence." [ ] Finally, "you know she's telling you the truth because of his actions."

The Defense did not object to any of trial counsel's "you know she's telling you the truth" arguments.

### c. Trial Counsel Improperly Disparaged Defense Counsel

During his closing argument, civilian defense counsel argued various points, which included the Government's failure to prove penetration beyond a reasonable doubt, the improbability of the sexual assault based on BT's testimony, and BT's inconsistent statements.

On rebuttal, trial counsel argued,

> Your Honor, it's never enough. It will never be enough from this table for the [D]efense. It doesn't matter what evidence comes into this courtroom; it's not as if they'll suddenly jump up and say, "Well, yeah, he must've done it."

> If she's offered three SAFE exams; and she does two and says, "No, I just can't do a third." It's not as if they'd suddenly would [sic] concede. So, if she does four exams and is offered a fifth; she suddenly say-- well, they'd suddenly say, "Yeah, we concede."

Civilian defense counsel objected to this argument, stating to the military judge, "It seems to be attacking defense counsel individually here, sir, and not necessarily arguing the facts of the case." The military judge sustained the objection. Immediately after the military judge sustained the objection, trial counsel continued, stating,

[T]he defense's entire closing argument to you was that you need to ignore the evidence that's been presented in front of you and focus on anything else. *Because, again, as I said before, from the defense's perspective, there's never going to be another—there'll never be enough. That's the point.*

. . . [I]nstead of paying attention to the seven times that she said he penetrated her body over 2 years, they want you to start parsing every single detail that she has to give during this whole process that's gone on, again, for 2 years.

. . . .

. . . [T]hey want you to parse every single detail from seven different interviews over 2 years so that you'd ignore the things that have been consistent from the day of the assault . . . . They spent all this time talking about, "Well, it may have been his penis. It may have been covered. It may have been exposed." They forgot to mention that she also said during that interview, "I am 100 percent certain that his penis penetrated my body." Because you can't look at that. You can't look at the injuries to her body. You can't consider the emotional state that she was in when she runs back into [SSgt DS's] room; because if you do, you'll convict him. *So that's why she can't win with this table.*

(Emphasis added).

Finally, trial counsel stated,

As I said, Your Honor, you can't look at [BT's] emotional reaction. You can't look at the marks on her body. You can't pay attention to what [SSgt DS], [SrA SSG], and [SSgt MM], the one thing they were all consistent on; and, you can't, because if you do you'll convict him. So that's why you have to parse [out] every single detail.

Other than the aforementioned objection, trial defense counsel did not object to the other parts of trial counsel's argument.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo." *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)). "If proper objection is made, we review for prejudicial error." *Id.* (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)). "If no objection is made, we hold the appellant has forfeited his right to appeal and review for plain error." *Id.* (citations omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious,

and (3) the error results in material prejudice to a substantial right of the accused." *Fletcher*, 62 M.J. at 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See Sewell*, 76 M.J. at 18 (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *Id.* (citation omitted). As our superior court has noted, trial counsel is

> the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Fletcher*, 62 M.J. at 179 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Prosecutorial misconduct occurs when trial counsel "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Id.* at 178 (quoting *Berger*, 295 U.S. at 84). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000)). Three factors guide our determination of the prejudicial effect of improper argument: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Fletcher*, 62 M.J. at 184. "Prosecutorial misconduct by a trial counsel will require reversal when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

"Trial counsel is entitled to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Frey*, 73 M.J. at 248 (internal quotation marks and citation omitted). However, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* (quoting *Berger*, 295 U.S. at 88).

"When a trial counsel offers [his] personal opinions, they become 'a form of unsworn, unchecked testimony and tend to exploit the influence of [the] office

and undermine the objective detachment which should separate a lawyer from the cause for which [he] argues.'" *Fletcher*, 62 M.J. at 179–80 (second alteration in original) (quoting *United States v. Horn*, 9 M.J. 429, 430 (C.M.A. 1980)). "There are many ways a trial counsel might violate the rule against expressing a personal belief or opinion. One is by giving personal assurances that the Government's witnesses are telling the truth." *Id.* at 180 (citation omitted). "Another is by offering substantive commentary on the truth or falsity of the testimony and evidence." *Id.* (citation omitted). "[I]mproper vouching occurs when the trial counsel places the prestige of the [G]overnment behind a witness through personal assurances of the witness's veracity." *Id.* (internal quotation marks and citation omitted). That said, trial counsel may marshal evidence in support of the proposition that a witness testified truthfully and argue that witness told the truth on the stand. *United States v. Chisum*, 75 M.J. 943, 953 (A.F. Ct. Crim. App. 2016), *aff'd on other grounds*, 77 M.J. 176 (C.A.A.F. 2018).

We also recognize that the lack of defense objection is some measure of the minimal prejudicial impact of the trial counsel's argument. *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (citation omitted).

### 3. Analysis

With respect to whether trial counsel mischaracterized SSgt DS's testimony by arguing that Appellant was "creeping around," that SSgt DS told Appellant to "go home," or that SSgt DS told Appellant BT was "going to bed," the record is clear that SSgt DS did not testify as to these exact words. However, we need not decide whether any part of trial counsel's argument was, in fact, improper. Rather, we conclude that regardless of whether the arguments were improper, Appellant failed to meet his burden of establishing the third prong of the plain error analysis. As discussed in more detail below, we find in our review of the record these comments did not substantially influence Appellant's conviction, nor otherwise materially prejudice a substantial right of Appellant.

As for trial counsel's "you know she's telling you the truth" arguments, we assume for purposes of our analysis that these comments amounted to clear and obvious error, as trial counsel's assertion that BT had been "consistent" with her version of the events was not fully accurate and could be viewed as trial counsel vouching for BT's testimony. Regarding Appellant's assertion that trial counsel made disparaging comments about defense counsel, for the purposes of our analysis, we will also assume without deciding that these later comments also amounted to clear or obvious error.

Appellant bears the burden of showing the clear or obvious errors in the trial counsel's argument resulted in material prejudice to his substantial rights. Using the three factors set out in *Fletcher* to guide our determination,

we find that trial counsel's comments were somewhat severe, and other than the one sustained objection, there were no measures adopted by the military judge to cure the misconduct. However, given that this was a judge-alone case, and that "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary," *Erickson*, 65 M.J. at 225, we will presume that the military judge was able to distinguish between proper and improper arguments. We find Appellant failed to provide any evidence to rebut the presumption that the military judge followed the law and disregarded any improper argument; moreover, there is no evidence in the record indicating the military judge found Appellant guilty of the offense based on trial counsel's improper argument. Furthermore, other than the one objection, defense counsel did not object to these portions of trial counsel's argument.

Finally, we look at the third *Fletcher* factor—the weight of the evidence. While the evidence was not overwhelming, the weight of the evidence supports Appellant's conviction. Appellant's behavior towards BT prior to the date of the incident, his behavior leading up to the incident, BT's immediate reaction to being sexually assaulted, Appellant's after-the-fact text messages, and BT's reporting on several occasions that Appellant had penetrated her vagina with his penis, support Appellant's conviction. We find trial counsel's comments were not damaging and did not result in material prejudice to Appellant's substantial rights. We are confident Appellant was convicted on the evidence alone and therefore find no relief is warranted.[11]

## D. Allegations of Ineffective Assistance of Counsel

Appellant alleges that he was denied effective assistance of counsel. He asks this court to consider the following deficiencies in the performance of trial defense counsel: (1) failure to object to portions of BT's testimony and BT's grandmother's testimony in presentencing; (2) failure to object to hearsay during Capt ICC's testimony; and (3) failure to object during trial counsel's argument. On the issue of trial defense counsel's failure to object to portions of BT's and her grandmother's testimony, we have determined this issue is without merit and warrants no further discussion or relief. *See Matias*, 25 M.J. at 361.

---

[11] Trial counsel are reminded that it is both improper "for a trial counsel to interject [his] personal views into a case," and "for a trial counsel to attempt to win favor . . . by maligning defense counsel." *Fletcher*, 62 M.J. at 181. Ultimately, defense counsel have a duty to defend their clients. Arguments of this nature miss the mark on defense counsel's duty to their clients.

**1. Law**

The Sixth Amendment[12] guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124. We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citations omitted). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if appellant's allegations are true, is there a reasonable explanation for counsel's actions; (2) if appellant's allegations are true, did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362 (citing *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). Regarding the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome;" instead, there must be a "probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

**2. Analysis**

In response to Appellant's assignment of error, we ordered and received declarations from both trial defense counsel—Appellant's civilian defense

---

[12] U.S. CONST. amend. VI.

counsel and his military defense counsel. Considering these declarations, along with the assertions Appellant makes in his assignment of error, we conclude that Appellant has not overcome the presumption of competence of his trial defense counsel.[13] We examine each allegation in turn.

Appellant argues that trial defense counsel's failure to object to the narrative portions of Prosecution Exhibit 7, the SAFE report, as well as to Capt ICC's testimony reciting the content of those pages, amounted to ineffective assistance of counsel. However, Appellant's trial defense counsel, Mr. RC, and Maj DM, both assessed that narrative portions of the SAFE report were beneficial to Appellant. Mr. RC specifically noted in his declaration that he and his appointed expert in sexual assault examinations "went over every line of the examination," and that it was their opinion that the "examination was helpful to [their] case" as "neither of [BT]'s two forensic medical examinations provided any physical evidence of forced penile penetration." Maj DM agreed with this assessment. As for trial counsel's improper argument disparaging the Defense, Mr. RC did object to trial counsel's first such argument and the objection was sustained. Mr. RC further declared that the military judge's ruling "made it clear that such argument would not be considered by the court." Mr. RC acknowledged he "could have objected to trial counsel further, but . . . [he did] not necessarily think those comments crossed the line or were so clearly improper as to warrant further objection," nor did trial counsel's "lines of argument [make] a difference in the trial."

We evaluate trial defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001) (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)). In each of these instances—particularly trial defense counsel's decision not to object to portions of BT's SAFE report—the record shows trial defense counsel made strategic decisions that were objectively reasonable, particularly given that neither of BT's two forensic medical examinations provided any physical evidence of forced penile penetration. Moreover, trial counsel was able to reasonably attack BT's credibility with the report by highlighting how BT's prior statements were inconsistent with her in-court testimony. In fact, the record shows trial defense counsel zealously

---

[13] We considered the declarations to resolve this issue pursuant to *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (observing a Court of Criminal Appeals is allowed to accept affidavits "when necessary for resolving claims of ineffective assistance of trial defense counsel . . . when those claims and issues are raised by the record but are not fully resolvable by the materials in the record"). Our consideration is limited to determining whether a factfinding hearing or other appellate relief is warranted. *United States v. Ginn*, 47 M.J. 236, 238 (C.A.A.F. 1997) (citations omitted).

and vigorously defended their client at each stage of the proceedings. We find trial defense counsel's actions were reasonable, their performance was not measurably below professional standards, and Appellant has failed to establish that relief is warranted in his case under the theory of ineffective assistance of counsel. Accordingly, we need not reach the question of whether there was a reasonable probability of a different result.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court